No. 14353

IN THE SUPREME COURT OF THE STATE OF MONTANA

1979

_____

STATE OF MONTANA,

        Plaintiff and Respondent,

  -vs-

PAUL BAD HORSE, JR.,

        Defendant and Appellant.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
              Honorable Charles Luedke, Judge presiding.

Counsel of Record:

    For Appellant:

        Stacey and Nye, Billings, Montana
        Calvin Stacey argued, Billings, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Mike McCarter argued, Assistant Attorney General,
         Helena, Montana
        James Seykora argued, County Attorney, Hardin, Montana

_____

Submitted:  October 30, 1979

Decided:  JAN 16 1980

Filed:  JAN 16 1980

_Thomas J. Kearney_
                Clerk

Justice John C. Sheehy delivered the Opinion of the Court.

Paul Bad Horse, Jr. appeals from a conviction and judgment entered in the District Court, Thirteenth Judicial District, Big Horn County, against him for the crime of robbery.

The charge against the defendant arose out of the April 5, 1975 abduction, robbery and murder of Monte Dyckman, a Safeway store employee in Hardin, Montana.

The circumstances surrounding the death of Monte Dyckman have been before this Court on several occasions. Companion cases include State v. Holliday (1979), ____ Mont. ____, 598 P.2d 1132, 36 St.Rep. 1535; State v. Radi (1978), ____ Mont. ____, 578 P.2d 1169, 35 St.Rep. 489; and State v. Fitzpatrick (1977), ____ Mont. ____, 569 P.2d 383, 34 St.Rep. 736.

About April 5, 1975, Bad Horse met in a Billings bar with Travis Holliday, Edwin Bushman, Gary Radi and Bernard Fitzpatrick, where the group planned to rob the Safeway store in Hardin, Montana. Bad Horse told the others that bank deposits for the Safeway store were made daily at approximately 10:00 p.m. A rough map of Hardin was drawn on a napkin, and Bad Horse pointed out on the map the depository bank for the Safeway store.

Later all five men met again at Radi's house. Fitzpatrick and Radi left for Hardin in Radi's car, while Bad Horse, Holliday, Bushman and two young girls went in another car. When the group met again in Hardin, they toured that city to survey the area. Bad Horse and Bushman pointed out the bank and the Safeway store to the others. Bushman produced some rope for use in the robbery, and Bad Horse went into a Hardin bar and borrowed a knife to cut the rope in pieces.

At approximately 10:00 p.m., the closing time of the Safeway store, the five men parked near the store. Radi and

Fitzpatrick were in one car, while Bad Horse, Holliday and Bushman were in another. Shortly after 10:00 p.m., a man came out of the Safeway store, got into his vehicle and drove away. Fitzpatrick and Radi followed him, telling their companions that if it developed that they were following the wrong employee, they would circle back to the drive-in bank to intercept the deposit there. Later Dyckman came out of the Safeway store. Dyckman's vehicle was followed by the vehicle in which Bad Horse, Holliday and Bushman were riding. When Dyckman turned into the drive-in bank, Bad Horse, Holliday and Bushman abandoned the pursuit knowing that Fitzpatrick and Radi would be there waiting for Dyckman.

Later Bad Horse, Holliday and Bushman picked up the two young girls and returned to Billings, arriving at Radi's house at approximately 2:00 a.m., April 6, 1975. Radi showed up shortly thereafter. He told them that he and Fitzpatrick had followed the first vehicle without success but had returned to the drive-in bank in time to intercept Dyckman with the Safeway deposit. Bad Horse then claimed to Radi that he was entitled to at least half of the proceeds of the robbery since he had set up the job. Bad Horse left angrily after being told the robbery produced little or no money.

On April 6, 1975, Dyckman was discovered dead in his own car near the Toluca interchange in Big Horn County. His hands were tied behind his back, and he had been shot twice in the head. The Toluca interchange is immediately off Interstate 90 between Hardin and Billings, some 12 miles west of Hardin.

This is the second time the Bad Horse case has been before this Court. He was originally tried jointly with Fitzpatrick, Radi and Holliday on charges of deliberate homicide, aggravated kidnapping, and robbery. Bushman was granted immunity from prosecution in exchange for his testimony at the trials of the other four defendants.

-3-

In the first trial, held in October 1975, Bad Horse was found not guilty of deliberate homicide and not guilty of aggravated kidnapping, but guilty of robbery. On appeal, this Court reversed and remanded his conviction for robbery because of errors in the instructions. State v. Fitzpatrick (1977), ___ Mont. ___, 569 P.2d 383, 34 St.Rep. 736. Upon remand, Bad Horse was retried only on the robbery charge and was again convicted.

Bad Horse raises the following issues on appeal:

(1) Retrial on the charge of robbery is prohibited because of the double jeopardy clause and the doctrine of collateral estoppel.

(2) The District Court had no jurisdiction because the crime occurred within "Indian Country".

(3) The District Court erred in determining that witness Raleigh Kraft, Jr., was not an accomplice.

(4) The testimony of Edwin Bushman, an accomplice, was not sufficiently corroborated by independent evidence.

(5) Gary Radi, a former codefendant who had been acquitted/a separate trial, should not have been allowed to testify at Bad Horse's trial.

(6) Bad Horse's second robbery conviction is not supported by substantial evidence.

(7) The instructions to the jury are in error under Sandstrom v. Montana (1979), ___ U.S. ___, 99 S.Ct. 2450, 61 L.Ed.2d 39.

Issue No. 1. Double Jeopardy and Collateral Estoppel.

Bad Horse's contentions under this issue are that his conviction of guilty of the crime of robbery in the first trial, with an acquittal of the charge of deliberate homicide, where the second charge necessarily incorporates the first charge, is legally inconsistent and unsupportable; that the law of the case on this point was established in the first appeal of his conviction; and that the State is collaterally estopped from retrying the robbery conviction.

-4-

A portion, but not all, of this issue was answered in State v. Fitzpatrick, supra, 569 P.2d at 395. Bad Horse claims that in Fitzpatrick, this Court held that "[t]hese verdicts are not merely inconsistent, they are legally unsupportable", and thereby the law of the case was established as to inconsistency. On the other hand, the State claims that because this Court did not order dismissal of the robbery charge in Fitzpatrick, but instead remanded the robbery charge for retrial against Bad Horse that the law of the case is on the side of the State. We therefore must examine Fitzpatrick to clarify precisely what this Court did hold in that case.

The problem addressed by this Court in Fitzpatrick, as it relates to Bad Horse, was the incongruity of instruction no. 28 used by the trial court when connected with instruction no. 36. Instruction no. 28 told the jury in effect that if a conspiracy to commit a crime existed and a death happened in the furtherance of the conspiracy, all the conspirators were alike guilty of the homicide. In conflict with that instruction, no. 36 told the jury that it might find any one of four verdicts, including one of guilty of robbery.

The jury in the first trial was obviously confused, because it sent out to the court a question asking ". . . If we find one defendant guilty of robbery does Inst. No. 28 require [a] guilty verdict on the two remaining counts." Instead of clarifying for the jury, the court responded that instruction no. 36, which permitted any one of four verdicts, answered the question.

Thus it appears that in the first trial, Bad Horse having been found guilty of the crime of robbery where his participation was that of a conspirator, should also have been found guilty of the crime of deliberate homicide, because the death of Monte Dyckman arose in furtherance of the conspiracy to commit robbery.

-5-

Fortunately for the defendant, the jury acquitted him on the charge of deliberate homicide. The State is now powerless to try him again on that charge because of the double jeopardy rule. That result may be laid, as it were, to the fortunes of war. That fortuitous result however, cannot be bootstrapped to deliver Bad Horse from his conviction of the crime of robbery for which he has been convicted now by two juries. The remand of Bad Horse's robbery conviction for retrial under Fitzpatrick, is a further by-product of the strategic error made by the State in the first Fitzpatrick trial, in joining at one trial four defendants with diverse roles in the incidents leading up to Monte Dyckman's death.

In clarification, therefore, this Court did not establish as the law of the case in Fitzpatrick that the verdicts relating to Bad Horse were so inconsistent that he could never again be tried for the crime of robbery. In point of fact, this Court did remand for retrial on that charge. His conviction of robbery could have been sustained by this Court after the first trial, except that his conviction was blemished by the errors that occurred to him and others joined as defendants in the trial. This Court did not find or believe that because he was not guilty under the jury verdict of deliberate homicide that he was likewise guiltless of the underlying charge of robbery. Rather, our remand was founded on the right of Bad Horse to receive a trial with a properly instructed jury. See, Section 46-16-401(5), MCA; State v. Jackson (1930), 88 Mont. 420, 435, 293 P. 309.

With that clarification, we find Bad Horse to be in the same situation with respect to his retrial as any other criminal defendant whose conviction is reversed and remanded for retrial. A defendant is not subjected to double jeopardy by virtue of his retrial after reversal of his judgment of conviction. State v. Ellsworth (1962), 141 Mont. 78, 81, 375 P.2d 316, 318. See also State v. Sanders (1973), 163 Mont. 209, 216, 516 P.2d 372, 376.

-6-

Appellate courts are not inclined to reverse convictions in criminal cases ordinarily merely upon the ground of inconsistency of verdicts reached by a jury as to a defendant who has been charged in several counts. Dunn v. United States (1932), 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed.2d 356; State v. Gone (1978), __ Mont. ____, 587 P.2d 1291, 1296, 35 St.Rep. 1540, 1546. At the core of such reaction is the reverence that courts feel for the part that juries play in the fact-finding process in criminal trials, even though allowing inconsistent verdicts in criminal trials runs the risk that an occasional conviction may have been the result of compromise. United States v. Carbone (1967), 378 F.2d 420, 423.

We determine therefore that the defendant has not been subjected to double jeopardy. In like manner, his contention that collateral estoppel is applicable to void his conviction is also rejected by us.

"Collateral estoppel", as explained in Ashe v. Swenson (1970), 397 U.S. 436, 443, 90 S.Ct. 1189, 1194, 25 L.Ed.2d 469, 475, on which Bad Horse relies, ". . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit."

It was determined in Benton v. Maryland (1969), 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707, that collateral estoppel is a part of the Fifth Amendment's guarantee against double jeopardy. We are cautioned by the United States Supreme Court that the inquiry as to whether collateral estoppel applies "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." Sealfon v. United States (1948), 332 U.S. 575, 579, 68 S.Ct. 237, 240, 92 L.Ed.2d 180; Ashe v. Swenson, supra, 397 U.S. at 444, 90 S.Ct. at 1194, 25 L.Ed.2d at 476.

It is again Bad Horse's position under his claim of collateral estoppel that the ultimate fact to be determined against him is whether he was guilty of the crime of robbery; that his acquittal of deliberate homicide also constituted an acquittal of the underlying felony, robbery; that therefore the underlying ultimate fact has been decided in his favor and he cannot again be retried.

Were we to accede to Bad Horse's collateral estoppel claim, we had then pulled the teeth from our holding foregoing that verdicts can be inconsistent and yet binding upon defendants. His claim however fails on two grounds: (1) his issue of ultimate fact had not been determined by a valid and final judgment in the first trial; and, (2) our inquiry, "set in a practical frame and viewed with an eye to all circumstances of the proceedings", does not disclose that collateral estoppel is applicable here. Since verdicts may be inconsistent and yet legally supportable, his conviction of robbery in the first trial was not a final judgment, since defendant secured a reversal and remand from this Court; in fact his conviction for robbery will not be final until this Court's decision in this appeal. When we examine the record of the prior proceedings, and take into account the pleadings, evidence, charge and other relevant matters in the prior proceedings, we have no trouble in concluding that the first jury, acting rationally, could have grounded its verdict of guilty of robbery on issues other than those required for deliberate homicide. As we said, the retrial was ordered by us in Fitzpatrick, because the first trial court erroneously instructed its jury that Bad Horse could be acquitted of deliberate homicide even though he was guilty of the underlying felony, robbery. In that set of circumstances, collateral estoppel does not apply.

We note that the United States Supreme Court said in Ashe v. Swenson, supra, that the defendant accused of participating

in a robbery with others was acquitted for lack of identification in his first trial. The State sought to retry him as to another victim of the same crime. It was to this fact situation that the United States Supreme Court found it proper to apply the doctrine of collateral estoppel as a species of the Fifth Amendment guarantee against double jeopardy. The holding in Ashe v. Swenson, supra, is simply inapplicable to this case.

Issue No. 2. District Court Jurisdiction.

Bad Horse's claim under this issue takes two tacks: (1) jurisdiction in this case fails because the crime occurred in "Indian Country" and, (2) the State failed to prove the venue of the crime. This jurisdictional objection is raised for the first time on appeal, but that is acceptable. State v. Akers (1938), 106 Mont. 43, 74 P.2d 1138.

Proper venue was proved at the trial. There is no evidence whatever that the Dyckman killing occurred upon Indian lands. The undisputed evidence was that the Dyckman robbery occurred in Hardin, continued onto Interstate 90, a federal highway, and thence to the Toluca interchange off that highway. The District Court could take judicial notice that the City of Hardin and the federal highway are all outside the exterior boundaries of the Crow Indian Reservation, but well within both Big Horn County and the State of Montana. State v. Campbell (1972), 160 Mont. 111, 118, 500 P.2d 801, 805.

Moreover, Hardin is not "Indian Country" within the definition of 18 U.S.C. 1151. We said so in the Matter of Little Light (1979), ___ Mont. ____, 598 P.2d 572, 573, /36 St.Rep./ 1269, 1271. In Little Light, we pointed to the decision of the United States District Court for Montana in Hawkins v. Crist (January 27, 1978), CV-76-99-BLG. That decision held that the agreement between the

-9-

Crow Tribe and the United States ratified by Act of Congress of April 27, 1904, 33 Stat. 352, wherein the tribe agreed to "cede, grant and relinquish" the tract of land comprising Hardin, disestablished this tract as "Indian Country" and thereby rendered it subject to state criminal jurisdiction.

Bad Horse contends that the landholdings between Indians and non-Indians in and around the City of Hardin make a "checkerboard" pattern identical to that in Seymour v. Superintendent (1962), 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346. In Seymour, it was held that such checkerboarded areas are nevertheless "Indian Country". However, the federal District Court, in Hawkins v. Crist, supra, distinguished Seymour, and found the controlling case to be Rosebud Sioux Tribe v. Kneip (1977), 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660. In Rosebud Sioux, the United States Supreme Court distinguished Seymour, holding that the Rosebud Sioux statutes evidence a Congressional intent to "disestablish" the land in question as Indian Country and permit the exercise of State jurisdiction. We agree with the author of Hawkins v. Crist, supra, that this was the Congressional intent when Hardin and its environs were disestablished.

Issue No. 3. Uncorroborated Testimony of an Accomplice.

Here Bad Horse claims that witness Raleigh Kraft, Jr., was an accomplice, and as such his testimony could not convict Bad Horse or support his conviction unless corroborated by independent evidence. Section 46-16-213, MCA.

The evidence indicates that Kraft had previously told Edwin Bushman that he was going to rob the Safeway store himself or get someone else to help him. Also, witness Marla Fitzler testified that she had heard Kraft discuss robbing the Safeway store with Bushman on several occasions.

-10-

Based on this evidence, Bad Horse contends that Kraft was an accomplice with all the disabilities attaching to his testimony flowing from that relationship.

The statements however, were made eight months to one year prior to the robbery. No connection was ever established in the evidence between those statements and the robbery, other than that they may have planted an idea in someone else's mind.

An accomplice is one who knowingly, voluntarily and with common intent with a principal offender unites in the commission of a crime. State v. Kerrigan (1930), 87 Mont. 396, 401, 287 P. 942. In this case, Kraft is not an accomplice as defined in section 45-2-302, MCA. He did not solicit, advise or encourage anyone in the planning or commission of the Dyckman robbery. He did not ever agree to aid or attempt to aid anyone in such planning or commission. His statements were made at a remote time and there is no concrete connection between those statements and the Dyckman robbery. Since Kraft was not an accomplice, his testimony stands on the same basis as any other witness. He need not be corroborated, and his credibility is for the jury to decide.

Issue No. 4. Sufficiency of the Testimony of Edwin Bushman.

Here Bad Horse claims that the testimony of Edwin Bushman, an accomplice, was not sufficiently corroborated by independent evidence.

Bad Horse's contentions on this point are that Bushman was an accomplice as a matter of law; that his testimony was not sufficiently corroborated; that the testimony of the other witnesses besides Bushman merely established that Bad Horse went to Hardin, drove around drinking beer with his companions, and returned to Billings that same night; that the evidence does

-11-

not tend to connect Bad Horse with the commission of the Dyckman robbery but only mere opportunity to commit that robbery. He also contends that the additional testimony points equally well toward innocent conduct as well as guilty conduct and thus does not qualify as corroboration. See State v. Keckonen (1938), 107 Mont. 253, 261, 84 P.2d 341, 346.

This contention of Bad Horse borders on the frivolous. Bushman's testimony is sufficiently corroborated by that of Ira Lee Finch, Cindy Morgan, Carol Branch, Ronald Potts, Lyle Doane, and Bad Horse himself. The most damaging corroborative testimony is that of Raleigh Kraft, Jr. who testified that Bad Horse told him that his friends were planning to rob the Safeway store, and on April 20, 1975, admitted to Kraft his participation in the robbery. The corroborative testimony is well within the tests laid down in State v. Cobb (1926), 76 Mont. 89, 245 P. 265.

Issue No. 5. Radi's Testimony.

Bad Horse here claims that it was reversible error to allow the prosecution to call Gary Radi as a witness over Bad Horse's objections. He contends that Radi's testimony was irrelevant and its only effect was to prejudice Bad Horse by casting suspicion on him.

Radi had been acquitted of all charges against him prior to his testimony at the Bad Horse trial. However, his testimony was relevant because he allegedly was one of the two principals in the Dyckman robbery. The State's case rested upon proving that Bad Horse conspired with, aided and abetted both Radi and Fitzpatrick in their carrying out of the robbery. The State expected Radi to deny any participation in the robbery, but that denial provided the foundation for the admission of Radi's prior and inconsistent statements where Radi had admitted his participation in the crime.

-12-

As a matter of fact, Radi's testimony may be construed to help Bad Horse as much as it did the State. In testifying, Radi denied any participation in the crime and testified he first met Bad Horse at his house on the evening of April 5, 1975. This conflicts with the evidence of others tending to establish that Bad Horse, Radi and the others had planned the robbery. The testimony of Radi was therefore relevant and clearly admissible. See, State v. Bentley (1970), 155 Mont. 383, 472 P.2d 864, 875; State v. Hay (1948), 120 Mont. 573, 194 P.2d 232, 237.

Issue No. 6. Sufficiency of the Evidence.

This issue is meritless in light of the considerable testimony against Bad Horse in this case. The evidence is viewed in a light most favorable to the State. State v. Pascgo (1977), _____ Mont. _____, 566 P.2d 802, 805, 34 St.Rep. 657. If there is sufficient credible evidence, the verdict will stand. State v. Swazio (1977), _____ Mont. _____, 568 P.2d 124, 126, 34 St.Rep. 676.

As indicated in the discussion of issue no. 4 above, Bushman's testimony was sufficiently corroborated by independent evidence. His testimony and that of the other witnesses sufficiently established that Bad Horse acted "with a purpose to promote or facilitate" the commission of the crime. Section 45-2-302, MCA.

Issue No. 7. Effect of the Sandstrom Decision.

This issue arose after the briefs in this case had been filed, but before the matter was set down for oral argument. When this Court received the decision from the United States Supreme Court in Sandstrom v. Montana (1979), _____ U.S. _____, 99 S.Ct. 2450, 61 L.Ed.2d 39, we requested argument in this case as to whether there was the possibility of error in light of the Sandstrom decision.

-13-

In _Sandstrom_, the United States Supreme Court found the trial court's instruction "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" unconstitutional. ___ U.S. at ___, 99 S.Ct. at 2453, 61 L.Ed.2d at 45.

The instruction given in the second _Bad Horse_ trial, which he claims has a _Sandstrom_ effect, is as follows:

"You are instructed that 'knowingly', or 'purposely' may be proved by circumstantial evidence. It rarely can be established by any other means. While witnesses may see and hear and thus be able to give direct evidence of what a defendant does or fails to do, there can be no eye witness account of the state of mind with which the acts were done or omitted. But what a defendant does or fails to do may indicate that he 'knowingly' or 'purposely' committed the offense or offenses charged.

"It is reasonable to infer that a person ordinarily intends the natural and probable consequences of acts knowingly done, knowingly omitted, purposely done, or purposely omitted. So unless the contrary appears from the evidence, the jury may draw the inference that the defendant intended all of the consequences which one standing in like circumstances and possessing like knowledge should reasonably have expected to result from any act knowingly done, knowingly omitted, purposely done, or purposely omitted.

"In determining the issue as to 'Knowingly' or 'purposely' the jury is entitled to consider any statements made and acts done or omitted by the defendant, and all facts and circumstances in evidence which may aid in the determination of the state of mind of the defendant."

It is obvious that the foregoing instruction is not mandatory as to intent, as was the case in _Sandstrom_, and that the instruction does not contravene the holding of In Re Winship (1970), 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. In other words, we do not determine from the foregoing instruction that the District Court has allocated a part of the burden of proof on the elements of the crime to the defendant by requiring him to come forward with evidence. We discussed this matter to some extent

-14-

in State v. Coleman (Decided December 19, 1979), ____ Mont. ____, ___ P.2d ____, 36 St.Rep. 2237. In the Bad Horse instruction, the jury was not given a mandatory presumption, as occurred in the Sandstrom case; rather it was told that it could reasonably infer intent on the part of Bad Horse for all the consequences which one acting in a like position would reasonably have expected. Nothing in the instruction lessens the duty of the State to prove every element of the crime charged beyond a reasonable doubt, nor does it affect the defendant's presumption of innocence which attended him throughout the trial. As the instruction stated, and as we discussed in State v. Coleman, supra, since intent is a matter for circumstantial evidence usually, inference may be the only method by which a jury can find intent. We also said in State v. Coleman, supra:

> "The holding in Sandstrom is not to be construed to mean that whenever a trial court instructs the jury that it may resort to inference to determine subjective matters such as knowledge or purpose, that thereby the State has been relieved of its burden of proof. The United States Supreme Court did not intend such limitation, and we do not find any such intention in the language of Sandstrom, or its related cases. The jury was not allowed to rest solely upon the permitted inference in the Coleman case, but under the instruction had to require such an inference to meet the standard as beyond a reasonable doubt." 36 St.Rep. at 2241.

We therefore determine that the instruction given in Bad Horse passes muster under the Sandstrom test.

CONCLUSION

The judgment of conviction against the defendant Paul Bad Horse, Jr. for the crime of robbery is affirmed.

_John C. Sheehy_
Justice

-15-

We Concur:

_Frank I. Haswell_
Chief Justice

_Gene B. Daly_

_John Conway Harrison_

_Daniel J. Shea_
Justices

-16-