No. 14797

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

_____

THE STATE OF MONTANA,

Plaintiff and Respondent,

vs.

HAROLD ARMSTRONG,

Defendant and Appellant.

_____

Appeal from:  District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone,
Honorable Robert W. Wilson, Judge presiding.

Counsel of Record:

For Appellant:

Berger, Anderson, Sinclair and Murphy, Billings, Montana
Donald W. Molloy argued, Billings, Montana

For Respondent:

Hon. Mike Greely, Attorney General, Helena, Montana
Chris D. Tweeten argued, Assistant Attorney General,
Helena, Montana
Harold F. Hanser, County Attorney, Billings, Montana
Charles Bradley argued, Deputy County Attorney,
Billings, Montana

_____

Submitted:  March 25, 1980

Decided: SEP 3 - 1980

Filed: SEP 3 - 1980

_Thomas J. Kearney_
Clerk

Mr. Justice John C. Sheehy delivered the Opinion of the Court.

This is an appeal from a judgment entered in Yellowstone County District Court, pursuant to a jury verdict finding Harold Armstrong guilty of the crimes of deliberate homicide and robbery. Although the facts have been set forth in a prior appeal, we will briefly iterate them.

At approximately 8:00 a.m. on January 22, 1975, the body of Lynn Lords was found in a boiler room located in a Billings alley. There were multiple stab wounds in Lords' neck, back and chest. The cause of death was determined to be due to a massive blood loss from the wound in the neck.

Lords had participated in a poker game at the Crystal Lounge in Billings on the previous night, January 21-22, 1975, until about closing time when he cashed in chips valued at about $400. Harold Armstrong participated in the same poker game but cashed in no more than $30 worth of chips at the end of the game.

Armstrong and Lords separately entered the Crystal Lounge early on January 21, 1975. Both men apparently left separately and by different exits at about 2:00 a.m., January 22, 1975. When Armstrong entered the establishment he was wearing a blue coat and a gunbelt holstering a pistol and sheathing a hunting knife. Armstrong checked the belt, gun and knife at the bar. He later gave the pistol to a Crystal employee as security for a loan of money. The pistol was never returned to him. He did however, pick up his knife and belt.

Shortly after 2:30 a.m., January 22, Armstrong drove his vehicle to a service station in Billings. He requested the attendant perform certain repair work on the van. Armstrong cleaned his vehicle and washed the floor mats and

a pair of boots while the attendant worked on repairing the vehicle. While Armstrong was paying for the repair work in cash, the attendant noticed Armstrong had a large amount of money in his wallet.

On the afternoon of January 22, 1975, Armstrong was arrested for shoplifting a blue coat from a store in Billings. The investigation relating to the shoplifting arrest eventually led to the charges involved in the instant case.

Armstrong was subsequently charged and convicted on April 15, 1975, of one count of deliberate homicide and one count of robbery, following a jury trial. He was sentenced to one hundred years and forty years imprisonment respectively, the terms to be served consecutively. On July 20, 1976, this Court entered its opinion affirming the judgment. State v. Armstrong (1976), 170 Mont. 256, 552 P.2d 616.

Armstrong thereafter filed a petition for a writ of habeas corpus in the United States District Court alleging inter alia that he had been denied the effective assistance of counsel. On December 6, 1977, the United States District Court issued an order granting the writ and directing that Armstrong be released or retried within ninety days. This order was stayed by the District Court pending appeal. On August 28, 1978, the United States Court of Appeals for the Ninth Circuit affirmed the District Court order and dismissed the stay order effective September 18, 1978.

A second trial was commenced on November 27, 1978. Prior to this second trial on November 16, 1978, the District Court entered an order denying the State's motion to use the first trial testimony of Lynn Helmey and Jo Strobbe. However, on November 29, 1978, this Court issued an order in response to the State's petition for a writ of supervisory

-3-

control, directing "the District Court to examine the transcript of the previous testimony and make a determination based on the record [as to] whether in fact the witnesses were effectively cross-examined, and based upon that determination, which shall be in writing, admit or deny the proffered testimony." The District Court made an order admitting the transcripts based on its finding that prior counsel had adequately cross-examined the witnesses.

On December 15, 1978, the jury returned verdicts of guilty on both counts. Armstrong received sentences identical to those imposed at the first trial, i.e. one hundred years for deliberate homicide and forty years for robbery to be served consecutively. This appeal follows.

The following issues are presented for review:

(1)  Is the verdict supported by substantial evidence?

(2)  Did the District Court err by denying the motions to suppress evidence based on an alleged illegal search and seizure?

(3)  Did the District Court err by denying appellant's motion for a change of venue?

(4)  Was the appellant denied a speedy trial?

(5)  Did prosecutorial misconduct deny appellant a fair trial?

(6)  Did the introduction of first trial testimony of absent witnesses deny the appellant a fair trial?

(7)  Did the District Court err in permitting impeachment of a defense witness by the use of a prior inconsistent statement allegedly not made by the witness?

(8)  Did the District Court err by admitting and excluding various items of evidence?

(9)  Did the alleged inadequacy of the autopsy report deny the appellant a fair trial?

-4-

ISSUE NO. 1:   SUFFICIENCY OF THE EVIDENCE

The rule is well settled that if substantial credible evidence exists to support a verdict, it will stand.   State v. Bad Horse (1980), _____ Mont. _____, 605 P.2d 1113, 1119, 37 St.Rep. 45, 53.   A defendant must be convicted on evidence that allows the jury to find beyond a reasonable doubt that he is guilty, and a verdict cannot be based upon a strong probability, a justifiable suspicion, or a shrewd conjecture that he is guilty.   State v. Konon (1929), 84 Mont. 255, 274 P. 1060; State v. Cooper (1926), 78 Mont. 35, 252 P. 376.

Here Armstrong contends that the circumstances and inferences adduced from the State's evidence is not sufficient to find Armstrong guilty beyond a reasonable doubt.

His contentions include these:

(1)   There was not sufficient time between 2:00 a.m., when the car dealer testified that appellant left the lounge until 2:30 a.m., when the night service station attendant testified he appeared at the service station, for Armstrong to murder the deceased, stuff the body in the boiler room after robbing him, walk three blocks to his vehicle, drive to a remote location on a road off the main Billings thoroughfare, hide the victim's wallet and his own clothes, and return to the Standard Station;

(2)   The gloves admitted by the State were not the gloves which witness Ibach testified were purchased by Armstrong in Big Timber in November 1974;

(3)   The evidence that Armstrong was dyeing his gunbelt and holster on January 22, 1975, in order to cover alleged bloodstains  is speculation which was refuted by the testimony of Donald Finch that he had been dyeing the gunbelt prior to the homicide;

(4)   The microscopic drop of blood on Armstrong's left

-5-

boot was not from the deceased and the bloodstain was not found on the boot on first examination;

(5)  The pubic hair on the appellant's shirt is not consistent with the State's theory that Armstrong had discarded his jacket due to his blood-soaked condition; he would have had to have zipped up his jacket so that the blood did not get on his shirt, which had no trace of blood on it;

(6)  The pubic hair found in the debris of the sack containing his left boot is also not plausible as it was impossible for pubic hair from the deceased to be transferred to the boots located in a shoe store in downtown Billings at the time the offense occurred;

(7)  Armstrong could not have hidden the victim's wallet in a culvert in the early morning of January 22, 1975, because Parsons did not discover the wallet although he walked the ditch regularly where it was found and had not seen it prior to May 5, 1975;

(8)  The measurements of Armstrong's knife show that he could not have inflicted the wounds upon the deceased.

The State's response is that Armstrong's approach is to isolate individual pieces of evidence and to identify speculative theories consistent with innocence.

It is true in this case that most, if not all, of the evidence against Armstrong is circumstantial. However, circumstantial evidence is not always inferior in quality. The determination as to the sufficiency of circumstantial evidence to make a case for the jury and to sustain a conviction is one to be made upon all the facts and circumstances which are to be taken into consideration collectively. State v. DeTonancour (1941), 112 Mont. 94, 98, 112 P.2d 1065, 1067.

In addition to the foregoing circumstantial evidence pointing toward the defendant Armstrong, there were other factors for the jury to consider. The defendant had motive, because he had little or no money on January 21, 1975. When he was arrested on January 22, 1975, he had $319.02 in cash including a $100 bill. He had spent another $100 bill earlier in the day and proof showed that the victim had two $100 bills in his possession shortly before his death. Armstrong left the bar within minutes of the victim and was next seen 30 to 35 minutes later at a point approximately 1.2 miles from the Crystal Lounge at the Standard Station washing his boots. The victim's wallet was found with a pair of trousers identified by Peggy Finch, Armstrong's sister, as belonging to Armstrong. Bloodstains were found on several items belonging to Armstrong. In November 1974, Armstrong had purchased a pair of gloves similar to the blood soaked gloves which were found at the scene of the crime. Armstrong did not produce the gloves which he purchased in November to refute the contention that the blood soaked gloves were in fact his. A bootprint similar in size and configuration to the sole of Armstrong's boot was found in the boiler room where the body was found. Armstrong was apprehended the day after the crime was committed, stealing a jacket similar to the one he had worn the night before.

In their collective weight, these factors are consistent with his guilt, and inconsistent with his innocence. We cannot therefore fault the jury verdict based on that evidence.

The test for sufficiency of the evidence in a criminal conviction is whether there is relevant evidence which persons of reasonable minds might accept as adequate to support a conclusion. State v. Azure (1979), ___ Mont.____,

-7-

591 P.2d 1125, 36 St.Rep. 514; State v. Pendergrass (1978),

_____ Mont. ____, 586 P.2d 691, 35 St.Rep. 1512; State v.

Merseal (1975), 167 Mont. 412, 538 P.2d 1366; State v. Cor

(1964), 144 Mont. 323, 396 P.2d 86.  The relevant evidence

here meets that test of sufficiency as far as this convic-

tion is concerned.

ISSUE NO. 2:  SEARCH AND SEIZURE

There were four searches in this cause.  On January 22

and January 28, 1975, warrants were issued authorizing a

search of Armstrong's trailer home and automobile.  On

January 22, 1975, the day of Armstrong's arrest, a warrant-

less inventory search of Armstrong's wallet was conducted.

On November 28, 1978, a warrant was issued authorizing a

body search of Armstrong. He contends here that all four

searches were illegal, and that the evidence obtained from

these searches should have been suppressed.

Search Warrants of January 22 and January 28, 1975

On November 17, 1978, the District Court suppressed all

evidence obtained under the search warrants issued on Janu-

ary 22 and January 28, 1975.  The order was based on State

ex rel. Sanford v. Dist. Court (1976), 170 Mont. 196, 551

P.2d 1005, which invalidated search warrants directed to

"any police officer in this State."  Thereupon the State

brought an action in this Court for a writ of supervisory

control relating to the District Court order.  State of

Montana ex rel. Charles A. Bradley v. Dist. Court (No.

14580, Decided November 29, 1978).  This Court accepted

jurisdiction of the petition for writ, and reversed the

order suppressing the evidence on the ground that Sanford

should not be applied retrospectively.  Three justices of

this Court signed the reversal order.  A fourth, the author

of this opinion, concurred, upon the reservation, among

-8-

other things, that the propriety of applying Sanford retro-
spectively could be considered on any subsequent appeal.

Until Sanford, a search warrant directed to "any police
officer" created a technical violation of the governing
statutes. This Court had refused to suppress evidence
seized under warrants issued in that style if it was exe-
cuted by the officer who applied for the warrant. State v.
Snider (1975), 168 Mont. 220, 541 P.2d 1204; State v. Tropf
(1975), 166 Mont. 79, 530 P.2d 1158; State v. Meidinger
(1972), 160 Mont. 310, 502 P.2d 58. The Sanford rule
changed the effect of those three decisions.

In assuming jurisdiction of the supervisory control
case, the majority of this Court decided that it would not
apply the Sanford rule here retrospectively. Johnson v. New
Jersey (1966), 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882.
The defendant argues that this Court should now reverse
itself and determine that retrospective application of the
Sanford rule as to the search warrant of January 22 and
January 28, 1975, should be applied. The searches there-
under occurred seventeen months before Sanford was decided.

In LaRoque v. State (1978), ___ Mont. ____, 583 P.2d
1059, 35 St.Rep. 1281, we stated a three-part test to deter-
mine whether a decision should be applied retroactively:

(1) The decision must establish a new principal of law
overruling established precedent on which litigants have
relied, or it must decide an issue of first impression, the
resolution of which is not clearly foreshadowed.

(2) The rule in question must be examined to determine
whether the threat of application will further or retard its
operation; and

(3) The equity of retroactive application must be con-
sidered.

Assuming that the Sanford rule was clearly foreshadowed in earlier decisions and that its retrospective application would force prosecutors to tighten their forms procedures for securing warrants, the defendant must still make the third hurdle, whether the equity of retroactive application favors him in this case.

The Sanford rule was intended by this Court to support and improve the integrity of the fact-finding process. Here retroactive application of the Sanford rule would exclude relevant and reliable evidence from the jury. We do not find that the interests of justice require such result. Moreover, equity does not favor retroactivity here. Both the courts issuing the search warrants and the police are entitled to rely on the rules in effect at the time the search warrant is issued. State v. Campbell, supra. We determine therefore not to apply retrospectively the Sanford rule in this case because to do so would vitiate the search warrants, and the evidence found through them.

We have been urged by the State to apply the "law of the case" rule, Fiscus v. Beartooth Elec. Cooperative, Inc. (1979), ___ Mont. ___, 591 P.2d 196, 36 St.Rep. 333, to this case. In view of the fact that the order granting super-visory control in the related cause was by a divided court, we have reviewed this matter again on appeal by a full court, and have determined that retrospective application of Sanford is not required by the equities of the case and would be adverse to the interests of justice.

Armstrong however, further attacks the warrants of January 22 and January 28, 1975, upon the grounds that they do not adequately describe the places to be searched and the things to be seized, that they do not sufficiently identify the issuing court and that they are not supported by probable cause.

-10-

We look first at the probable cause contention. The affidavit supporting the warrant of January 22, 1975, informed the issuing court that: Lynn Richard Lords had died in the early morning hours of January 22, 1975, by multiple stab wounds apparently made by a knife; investigation had shown that Lords had been playing poker at the Crystal Lounge and had left about 1:30 a.m. on the morning of January 22, 1975; he had in his possession two $100 bills; Harold Armstrong had been identified as playing in the game at about the same time as the victim; Armstrong had checked a revolver and a hunting knife with the bartender at the time of his entry in the game; Armstrong was a loser and had hocked the gun for money to continue the game; Armstrong did not cash in any chips at the end of the game and the knife was returned to him when he left the bar; on the same day at 3:30 p.m., Armstrong was arrested by the Billings police department for shoplifting; he had in his possession a $100 bill, plus an additional $199.07 in bills and change; one $5 bill appeared to have blood on it; and Armstrong had been wearing a blue jacket, blue levis and shoes; when arrested he was wearing tan cowboy boots, and no jacket.

The application for the January 28, 1975, search warrant included a recitation of the foregoing facts essentially, and in addition thereto recited that further investigation by the police had turned up a witness from a Standard Service Station who at 2:35 a.m. on the morning of the victim's death observed Armstrong go to the washroom where he washed off a pair of green boots, and a plastic floor mat from the vehicle he was driving.

Based on these alleged facts, the courts in each case issued a search warrant, on January 22, 1975, for a described Chevrolet van and a trailer home where Armstrong

-11-

had been staying, and the other for a further search of the Chevrolet van, also described. Our examination of the applications for the search warrants show that they contain sufficient facts to enable an impartial magistrate to determine whether probable cause existed under the Fourth Amendment. In judging probable cause, we do not require that the issuing magistrates be confined by "niggardly limitations or by restrictions on the use of common sense" and the determination of probable cause by a magistrate is paid great deference by this appellate court. State ex rel. Garris v. Wilson (1973), 162 Mont. 256, 511 P.2d 15. The applications established that probable cause existed. There is no substance to Armstrong's contentions that the objects to be seized and the premises to be searched were not sufficiently identified. In each warrant, the vehicle and in the first warrant, the trailer home were specifically described. Moreover, the name of the court issuing the warrant is set forth in the caption of the warrant.

We therefore hold that the warrants of January 22 and 28, 1975, were validly issued and fully met the legal requirements for the issuance. Therefore, the motions of Armstrong to suppress the evidence acquired thereunder were properly denied by the District Court.

We now look at the inventory search of January 22, 1975. This was the date of Armstrong's arrest for shoplifting. During an inventory search, the Billings Police seized a $100 bill from his wallet. The attack by Armstrong on this item is that the inventory search was illegal and therefore the $100 bill should be suppressed from the evidence.

Shoplifting is a misdemeanor for which bail bond schedules are established in Yellowstone County. The arresting officer refused to accept the scheduled bond and kept

Armstrong in custody. Armstrong now argues that he should have been allowed to post bond. In that way, his billfold and its contents would have been returned to him when he was released.

However, the officer arresting Armstrong knew that he was a major suspect in Lords' homicide at the time. In that circumstance, the police had not only the right to refuse bail bond, but the duty to detain him. People v. Cocroft (1967), 37 Ill.2d 19, 225 N.E.2d 16, 19.

The inventory search of Armstrong which turned up the $100 bill in his wallet, was incident to a lawful arrest, section 46-5-101, MCA, and since the bill was lawfully seized, is admissible as evidence in any other prosecution or proceeding as well as the offense for which the search was originally made. Section 46-5-104, MCA.

We now look at the contentions relating to the search warrant of January 28, 1975. On that date a search warrant was issued authorizing the seizure of pubic hairs from Armstrong. He contends that the seizure violated his right against self-incrimination, violated his due process rights and again that the search was not based upon probable cause.

The State concedes the body search comes within the ambit of the Fourth Amendment warrant requirement. It contends however, that ample facts in the application sup-ported a finding of probable cause by the issuing magistrate. The affidavit for the search warrant recounts the testimony of an expert witness at Armstrong's first trial. That testimony established a connection between Armstrong and the homicide by a comparison of pubic hairs of Armstrong and the victim Lords. The State was asking for the warrant to seize additional hairs because of the fact that the hairs used in the first trial had been obtained with counsel's consent,

and the federal court had determined that Armstrong had been rendered ineffective assistance at his first trial. The hairs at the first trial tended to connect the defendant with the victim and the crime. The court found probable cause and issued the warrant. We agree that probable cause existed as the affidavit in application therefore set out sufficient facts to disclose the evidentiary value of the pubic hairs.

The due process claim of Armstrong is that it was improper to issue the search warrant after jeopardy attached.

The claim is novel, and no authority is cited in connection with this contention. Perhaps, if prejudice to the defendant had occurred by virtue of the issuance of the search warrant, some due process rights of the defendant might have been offended. Here however, the court was careful to offer such additional time to the defendant as he might need to meet any testimony that might be given with respect to the newly seized pubic hairs. No prejudice is otherwise pointed out by Armstrong in this appeal.

As far as the self-incriminatory nature of the seizure of pubic hairs is concerned, that issue was decided in Schmerber v. California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908. The Fifth Amendment protects an accused only from being compelled to provide evidence of a testimonial or communicative nature. The Schmerber case involved a blood sample, but the same rationale applies to pubic hairs.

ISSUE NO. 3: CHANGE OF VENUE

In pretrial motions, Armstrong sought a change of venue and the appointment of an independent pollster. The venue change and pollster were demanded on the basis of prejudicial

-14-

pretrial publicity. The motions were supported by defendant's affidavit reciting the existence of pretrial news coverage, accompanied by copies of the news articles of the Billings Gazette and also an affidavit of his counsel which recited that he had heard numerous comments from persons who had formed an opinion as to the defendant's guilt. Counsel's affidavit further stated that a scientific poll would disclose widespread prejudice in the community. The court heard the argument on the motion to appoint a pollster on November 2, 1978, and denied the same on November 6, 1978. The court heard the argument on the venue motion on November 8, 1978, and denied that motion on November 13, 1978.

On November 21, 1978, both motions were renewed on the basis of an article appearing on that date in the Billings Gazette. The court heard evidence and argument in support of the renewed motions on November 22, 1978. Again the court denied the motion for an opinion pollster, and reserved ruling on the venue motion pending voir dire of the jury panel. The venue motion was denied following voir dire.

With respect to the pollster motion, Armstrong contends that he has been denied equal protection of the law, alleging that a pollster was necessary to establish the grounds for a change of venue and to assess the existence of prejudice in the county, and that the denial of the pollster to an indigent defendant was unconstitutional.

We discuss the denial of the two motions together because the issues intertwine. As noted in State v. Williams (Iowa 1979), 285 N.W.2d 248, 266, the defendant overstates the problem with respect to the pollster. The question is whether the trial court denied him the means to avoid being tried in a county where, because of the dissemination of

-15-

potentially prejudicial material, there was a reasonable likelihood that he could not receive a fair trial. State v. Williams, supra; and see State v. Powers (Idaho 1975), 96 Idaho 833, 537 P.2d 1369, cert.den. 423 U.S. 1089, 96 S.Ct. 881, 47 L.Ed.2d 99.

We agree with the procedure adopted by the District Court. Armstrong has not indicated that the voir dire examination of prospective jurors disclosed any prevalent opinion against him in the community or among the panel members, nor any overriding prejudice which the prospective jurors could not put aside. In other words, the District Court here gave Armstrong, through his counsel, the opportunity to dig out and expose, through voir dire examination, any bias or prejudice that would have prevented a fair trial of the defendant. The voir dire examination did not reveal any such prejudice. The court therefore had properly denied the motion for an opinion survey at county expense.

The voir dire examination here failed to reveal such bias or prejudice as prevented a fair trial for the defendant or made his representation by counsel ineffective. As to the motions for change of venue, the indicia of "undue prejudice" identified in State v. Board (1959), 135 Mont. 139, 143, 337 P.2d 924, do not appear here. Those were identified as (1) aroused feelings in the community, (2) threat to personal safety of the defendant, (3) established opinion of members of the community as to the guilt of the accused, (4) news articles beyond the objectivity of news printing and dissemination, and (5) difficulty or failure in securing a fair and partial jury. In this case, the defendant submitted news articles which show extensive publicity, but do not show editorializing on the part of the media or any calculated attempt to prejudice public opinion against him

-16-

or to destroy the fairness of the pool from which his prospective jurors would be drawn. We have no indication here that the published accounts were so passionate as to excite undue prejudice against the defendant. State v. Logan (1970), 156 Mont. 48, 473 P.2d 8ა3; Hanrahan v. District Court (1965), 145 Mont. 501, 401 P.2d 770.

Because Armstrong has not shown any prejudice resulting from the denial either of the motion for change of venue or the motion for a public opinion survey, there is no need for us to reach the question of whether Armstrong is denied equal protection of the laws as an indigent because he could not afford a public opinion survey whereas a defendant with means might be able to do so.

The remaining contention with respect to this issue is whether it is a violation of the equal protection of the law to allow the State to appeal the denial for change of venue but to refuse that same right to a defendant. Under sections 46-20-103 and 46-20-104, MCA, the State but not a defendant is allowed an interlocutory appeal of a District Court's determination denying a change of venue.

Relying on Groppi v. Wisconsin (1971), 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571, Armstrong asserts that this Court must apply strict scrutiny to the contested statutes, since proper venue involves the minimum standards of due process. However, Armstrong has not shown the failure to change venue denied him an impartial jury. Since he has failed to show the impairment of a fundamental right, we apply the "rational basis" test to determine the constitutionality of the appellate procedures of orders on motions for a change of venue.

The answer is simple. The State has no right to appeal following a conviction or acquittal. Therefore, the allowance

-17-

to the State of an interlocutory appeal for review of orders respecting place of trial, prior to conviction or acquittal, serves a purpose, that the public interest be protected in the handling of criminal cases. There is a rational basis for these appeal provisions in the statute.

Moreover, the issue respecting the difference between the State and the defendant as to right of appeal in this instant case was not raised at the trial court level. We do not review it upon appeal. See Henry v. Mississippi (1965), 379 U.S. 443, 448, 85 S.Ct. 564, 567-568, 13 L.Ed.2d 408, 413.

ISSUE NO. 4:  SPEEDY TRIAL AND LATENT BOOTPRINT

Armstrong maintains his right to a speedy public trial has been denied.

In speedy trial determinations, one factor to be considered is the length of the delay in trial. State v. Harvey (1979), ___ Mont. ___, 603 P.2d 661, 667, 36 St.Rep. 2035, 2041. There is no need to examine other factors unless there has been some delay which is deemed presumptively prejudicial.

Armstrong asserts this Court should determine the length of the delay to be about three and one half years, the time from his original conviction to his second conviction. The assertion is unsupportable. We will not consider the time period from Armstrong's initial notice of appeal to this Court until remittitur was issued from the Ninth Circuit Court of Appeals, from May 9, 1975 to August 28, 1978. Such time is not included within the computation of a speedy trial delay. During that period, the Montana District Court was without jurisdiction to engage in proceedings leading to a retrial. State v. Ward (1978), 120 Ariz. 413, 586 P.2d 974, 976-77.

-18-

After subtracting the time during which this cause was in the appellate courts, the period of delay, 108 days, is not long enough to be deemed presumptively prejudicial. The length of delay is much shorter than for example, Fitzpatrick v. Crist (1974), 165 Mont. 382, 528 P.2d 1322, a seven-month delay case.

## The Bootprint Argument

As an adjunct to a speedy trial claim, the defendant contends that the bootprint photographs and transparencies should have been suppressed under the rule of Brady v. Maryland (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. He cites these grounds: that the original copy of the Polaroid photograph was not forwarded to Judge Smith for his consideration in the federal habeas corpus proceeding which resulted in Armstrong's retrial; that the photograph was not furnished to the defendant prior to trial in accordance with Judge Wilson's discovery order; and that the defendant had insufficient opportunity to inspect the exhibits prior to trial.

At the time of the crime, Lieutenant Aukshun had taken a Polaroid photograph of the floor area of the boiler room in which the victim's body was found. Later, a paralegal in the county attorney's office claimed to discern a bootprint in the photograph but it was not introduced at the first trial.

After the first trial, the photograph was enlarged, and in the process the original photograph and enlargement were lost, but a negative of the original Polaroid photograph was retained by the photographer. When the judge in the Federal District Court case ordered the delivery to him of all evidence, the photograph was inadvertently excluded in the evidence delivered to that court.

-19-

Prior to the second trial, the State moved to endorse as witnesses persons who could testify with respect to the photograph, which motion was granted by the trial judge. The judge also authorized the employment of a photographic expert for the defendant to evaluate the photograph and the photographic procedures. The expert was allowed to travel to Great Falls at State expense to view the preparation of the enlargement and transparencies which were later introduced at trial.

Armstrong's contention is that the admission of the photographic exhibits violated the State's discovery duty under Brady v. Maryland, supra.

It appears in the record that with respect to the second trial, all orders respecting delivery of evidence were complied with, and the court went further to allow the attendance of experts on the defendant's behalf and copies of all material were delivered to the defendant's representatives eighteen days prior to the testimony of the State's witnesses relating to the photographs.

The State contends Brady v. Maryland is not in point. That case dealt with the suppression by prosecution of exculpatory evidence. Here the evidence was inculpatory and was not withheld from the defendant. State v. Craig (1976), 169 Mont. 150, 153, 545 P.2d 649, 651. We see no merit in Armstrong's contentions with respect to the use of the photographs relating to the bootprint.

ISSUE NO. 5:  PROSECUTORIAL MISCONDUCT

Two instances of alleged prosecutorial misconduct are pointed out by the appellant as grounds for reversal on the fifth allegation of error. First, the State in its closing argument stated in part:

-20-

"The proof must be to you beyond a reasonable doubt, but read that instruction, it doesn't say beyond any doubt. The only time we are sure of something is when we see it with our own two eyes. You feel it, you smell it, and you taste it. You weren't there. If you were, you would be witnesses, but we have given you more evidence than you will see in another murder case where there is not an eye witness.

"This man is guilty as sin. Do not be confused by language of the phony boot trick, the planting of blood, the accidental transfer of hairs, planting of blood on a watch, planting of blood on money. We didn't plant the jacket on him, we didn't plant the knife on him, we didn't plant him in that game, we didn't plant the money on him."

Disciplinary Rule No. 7-106(C)(3)(4) of the Canons of Professional Ethics which were adopted by this Court on April 25, 1973, states:

"In appearing in his professional capacity before a court, a lawyer shall not:

". . .

"(3) Assert his personal knowledge of the facts in issue, except when testifying as a witness,

"(4) Assert his personal opinion as to the justness of the cause, as to the credibility of a witness, as to the culpability of a civil litigant, or as to the guilt or innocence of an accused; but he may argue, in his analysis of the evidence, for any position or conclusion with respect to the matter stated therein."

Although this Court does not approve of the State's usage of the above emphasized simile, we do believe that when taken in context with the language of the remainder of the closing argument to the jury, the cited language appears to be based upon the State's analysis of the evidence and is not an expression of the State's personal opinion within the explicit purview of the disciplinary rules.

While cross-examining the appellant, the prosecutor chalked in lines on the blackboard, resulting in the following objection:

"(Mr. Bradley writing on chart at this time.)

"MR. WHALEN: Your honor, I object to this drawing Mr. Bradley is putting up on the board for the reason that it amounts to a comment upon the evidence and invades the province of the Court and

-21-

jury, is not a proper mode of examination.

"THE COURT:  I don't understand the purpose of the drawing.

"A.  Well, he is writing lie on there.

"Q.  You did lie, didn't you, Mr. Armstrong?  A. Many times, yes, sir.

"THE COURT:  Objection sustained."

In addition to sustaining the objection, the court submitted its jury instruction which informed the jury:

"Statements of counsel are not to be regarded by you as evidence and you will disregard any such statements which are not supported by the evidence received upon this trial."

From the record, it appears that what the prosecutor was doing in the cross-examination of Armstrong was to place a chalkmark upon the board with respect to each answer that he received from Armstrong in such manner that on the completion of his questioning, the word "lies" or "liar" would appear on the blackboard.  While this sort of conduct stretches our lenience to the fullest extent, we observe that the court moved quickly to sustain the objection, and later to instruct the jury to remove any possible prejudice from the actions of the prosecutor. Of course, we cannot assume that the jury considered evidence to which objections were timely made and sustained, nor that the jury did not follow the instructions of the court. Therefore, we find no prejudice on this point.

ISSUE NO. 6:  TESTIMONY FROM THE FIRST TRIAL

Armstrong asserts that the District Court erred in admitting the first-trial testimonies of Lynn Helmey and Jo Strobbe who were not available for the second trial.  Appellant's objection on this point is that counsel at the second trial was forced to use the cross-examination of a prior attorney who had been declared inadequate as a matter of law, thus

-22-

denying appellant the effective assistance of counsel at the second trial also.

This was one of the issues which was brought to this Court's attention in the petition for supervisory control, to which we have already adverted. In making our order on that petition, the majority of the court directed the trial court to examine the transcript of the prior trial, and if it determined therefrom that the cross-examination was indeed effective, to permit its use at the second trial of Armstrong. The court made a finding that the prior defense counsel had adequately examined the witnesses. Armstrong presents no error in the court's finding in that regard. Therefore, the order of the District Court admitting such testimony will stand.

ISSUE NO. 7: PRIOR INCONSISTENT STATEMENT

Florence LaFleur, Armstrong's sister, testified on his behalf at trial. She stated on direct examination that defendant had lived with her husband and herself during December 1974 and January 1975. She testified that the trousers found with the victim's wallet did not belong to Armstrong. She also stated that the defendant liked to flash large denominations of currency. The final point of her testimony went to the nature of a gunshot wound in Armstrong's hip. Florence LaFleur testified that the wound was inflicted accidentally by her husband.

On cross-examination the State inquired into the circumstances of the shooting. Over objection, the prosecutor asked the witness whether her husband had ever stated in her presence that the wound was purposely inflicted. The witness responded, "I don't know if he said that or not. I told you before, I was not listening to them, I was nervous enough

-23-

without listening to that officer and him talking." The State later called Officer Knutson as a rebuttal witness who testified that LaFleur's husband had indicated that the shooting was intentional.

The State concedes the error in admitting this testimony, as inconsistent hearsay on a collateral matter. The State contends however, that no prejudicial error occurred from the admission of the testimony.

Armstrong contends that the allowance of the testimony damages the credibility of LaFleur, and established his character as a violent person. Armstrong relies on Chapman v. California (1967), 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, as requiring reversal unless the error can be declared harmless beyond a reasonable doubt.

Chapman rejected the rule that all federal constitutional errors required automatic reversal of a conviction. In State v. McKenzie (1980), ___ Mont. ___, 608 P.2d 428, 458, 37 St.Rep. 325, 357, this Court stated:

> "As far as we can determine, the United States Supreme Court has not yet fashioned a uniform standard for determining harmless federal constitutional error beyond Chapman. See Harmless Error: The Need For A Uniform Standard, St. John's Law Review, Vol. 53, Spring 1979, No. 3, p. 541; Assessing The Harmlessness of Federal Constitutional Error--A Process In Need of a Rationale, University of Pennsylvania Law Review, December 1976, Vol. 125, No. 2, p. 15. At least three definable approaches appear in United States Supreme Court cases:

> "(1) focusing on the erroneously admitted evidence or other constitutional error to determine whether it might have contributed to the conviction. e.g. Fahy v. Connecticut (1963), 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171;

> "(2) excluding the constitutional infirmity where overwhelming evidence supports the conviction, e.g. Milton v. Wainwright (1972), 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1;

> "(3) determining whether the tainted evidence is merely cumulative or duplicates properly

-24-

admitted evidence. e.g., Harrington v. California (1969), 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284.

"Under such circumstances, we feel free to adopt any of the three standards in assessing federal constitutional harmless error within the confines of Chapman . . ."

We find the first approach the only one applicable in the present case. Viewing the admitted error in light of all the facts, we find beyond a reasonable doubt that the error in this particular case was harmless because it did not contribute to appellant's conviction.

The collateral matter impeached in this case indicated only that the appellant had at some prior time been shot by his brother-in-law while in the company of his sister. Whether his brother-in-law had committed the shooting intentionally or accidentally, the evidence amounted only to making Armstrong the victim, and could not arouse in the jury any feelings against Armstrong based upon the intention or lack of intention on the part of LaFleur's husband. We therefore find that error harmless.

ISSUE NO. 8: FURTHER EVIDENTIARY ERROR

Armstrong also argues that prejudicial error occurred by the court either admitting or excluding the following items of evidence:

(1) Shoplifting evidence. The State submitted evidence showing Armstrong shoplifted a light blue coat in the afternoon of the day that Lords was killed. Armstrong contended it was error to admit the shoplifting evidence because it was evidence of a distinct and independent crime which was not admissible here and there was no evidence showing that the coat formerly worn by Armstrong had been destroyed.

The shoplifting evidence tended to show the destruction or suppression of evidence by Armstrong and tended to show

-25-

his guilt and was therefore relevant and clearly admissible. If evidence tends to prove the commission of the crime charged, it is not rendered inadmissible because it also tends to prove the commission of another crime. The test is whether the evidence is relevant as tending to prove any facts material to an issue in the cause before the court. State v. Cesar (1925), 72 Mont. 252, 255, 232 P. 1109.

(2) Boots with the blood spot. Armstrong's boots were admitted and the testimony showed that there was a blood spot upon them. The boots had been sent to the FBI in separate bags. No blood was discovered on the boots during their initial examination by the FBI. Upon resubmission by the Billings police, a blood spot was discovered. According to Armstrong, these facts affirmatively show a change in the condition of the boots while in police custody. Armstrong asserts it was error to admit the boots since a proper chain of custody was not shown.

The testimony of the police officers Bruce and Ross and the FBI agent Semmes established *prima facie* that no one tampered with the boots. Once this was shown, the burden of proving tampering shifted to Armstrong. State v. Burtchett (1974), 165 Mont. 280, 287, 530 P.2d 471, 475; cert.den. 420 U.S. 974. The fact that the FBI found no blood on the boots when they were initially examined does not mean that there was no blood on them; it merely means that the FBI did not find the blood in the first instance. This is not proof of tampering while in police custody.

(3) Clothes found in a ditch near the city dump. These exhibits were: a Pendleton shirt and two pairs of trousers found in a ditch on the road to the city dump. Armstrong contends error, since the State failed adequately to establish

-26-

the chain of custody. Armstrong contends that the State must show a complete chain of custody from the time of Lords' homicide until the introduction into evidence, and if a link in the chain of possession is missing, the exhibit may not be admitted.

The adequacy of the foundation for admission of such evidence is within the District Court's discretion, and the District Court's determination will not be reversed absent a clear abuse of discretion. State v. Thomas (1975), 166 Mont. 265, 268-269, 532 P.2d 405, 407.

The State established a complete chain of custody from the time of finding the clothes until the clothes were introduced into evidence. The possibility of tampering prior to the finding is mere conjecture. Such conjecture is not sufficient to preclude the clothes from being introduced into evidence. Armstrong has not met his burden of affirmatively showing that some tampering with that evidence has taken place. State v. Thomas, supra.

(4) Photo of latent bootprint. In addition to the objections to the photograph of the latent bootprint to which we have earlier adverted, Armstrong contends it was error to admit this photograph and the testimony of Officer Anderson concerning the bootprint. Armstrong contends that the State failed to prove the photograph was taken before the crime scene was disturbed by investigating officers.

(5) Testimony established when the photograph was taken. Armstrong contends he was not positively identified as the source of the print. However, such identity need not be positive in order for the print to be admissible. Any uncertainty in the identity or method of identification goes to the weight of the evidence and not its admissibility. People

-27-

v. Robbins (1974), 21 Ill.App.3d 317, 315 N.E.2d 198, 203.
The foundation for the photograph was sufficient.  Lamb v.
Page (1969), 153 Mont. 171, 176, 455 P.2d 337, 340.

(6)  Blood-soaked jacket.  The court refused to admit
into evidence Armstrong's exhibit, a blood-soaked jacket
found in a hotel room near the scene of the crime.  The blood
on the jacket was human type "0", the same as that of Lords.
The jacket was discovered in a Billings hotel room.  An
investigation revealed the blood was deposited on the coat
some six weeks prior to the Lords' homicide.  The jacket was
not relevant and/was inadmissible.  Rule 402, Mont.R.Evid.

(7)   Testimony of Cannon and Ross.  In the examination
of two rebuttal witnesses, Cannon and Ross, the prosecutor
repeatedly questioned them in such manner as to draw objections
which were sustained by the trial court.  The reasonable
inference to be drawn from the questions was that Armstrong
did not have bank accounts in Hawaii and was not receiving
money from Hawaii as he had earlier testified.  The purport
of the questions, Armstrong contends, was to imply the exist-
ence of an independent crime on the part of Armstrong, the
writing of bad checks.  The jury was admonished to disregard
the rebuttal testimony of Cannon and Ross by the District Court.

Misconduct by the prosecution may form the basis for a
new trial where the prosecution's conduct deprived the
defendant of a fair and impartial trial.  Willful attempts
by counsel to place excluded evidence before the jury may
result in a reversal.  State v. Bain (1978), ___ Mont. ___,
575 P.2d 919, 35 St.Rep. 257, 261-262.

We determine the examination was not an attempt to
place before the jury the assumption of damaging facts which
could not be proven.  Rather, the questioning was an attempt

-28-

by the prosecution to fit within an exception to the hearsay rule. When on objection, the prosecution discovered that it could not so interrogate the witnesses, the prosecution refrained from further such examination. We find no prejudice in the incidents.

(8) Autopsy report. The remaining issue is a question of fact as to whether the measurement of appellant's knife blade was consistent with the measurements found in the autopsy report concerning the decedent's stab wounds. Armstrong contends that the length of the blade on the knife in evidence, and its width, are not sufficient to comply with the length of the knife wound found in the decedent's body or the width. It is, however, the exclusive function of the jury to determine the credibility of witnesses, to resolve evidentiary conflicts, and to assign such weight to the evidence as it may determine. United States v. Brady (9th Cir. 1978), 579 F.2d 1121, 1127; State v. Glidden (1974), 165 Mont. 470, 473, 529 P.2d 1384, 1386.

Although Armstrong argues that it was impossible for his knife to inflict the wounds found on the deceased as evidenced by the respective measurements of the wound and of the knife, and the lack of hilt marks, these are factual arguments which the jury determined.

Judgment of conviction is affirmed.

_____
                    Justice

We Concur:

_____
        Chief Justice

_____
               Justice

_____
Hon. Peter G. Meloy, District
Judge, sitting in place of Mr.
Justice Daniel J. Shea        -29-

Mr. Justice John Conway Harrison concurring:

I concur, but wish to note that in my opinion this is a classic case where one judge in the federal system erroneously granted habeas corpus. The medical testimony introduced at the federal hearing, when matched by the expert pathology testimony introduced at both trials, fails to qualify as expert testimony worthy of consideration in overcoming the evidence introduced by the state. As a result, the state has been put to a costly second trial, in my opinion, needlessly.

_John Conway Harrison_
Justice